**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**JOHN UNDERWOOD and
JOSEPH UNDERWOOD, d/b/a
STARKVILLE ATHLETIC CLUB**             **PLAINTIFFS**

**v.**           **CIVIL ACTION NO. 1:20-CV-00085-GHD-DAS**

**CITY OF STARKVILLE, MISSISSIPPI**           **DEFENDANT**

**OPINION GRANTING DEFENDANT'S MOTION TO DISMISS**

Presently before the Court is the Defendant's Motion to Dismiss, citing Federal Rule of Civil Procedure 12(b)(6) and the issue of standing [10], in response to the Plaintiff's claims alleging violations of the Fourth, Fifth, and Fourteen Amendments of the U.S. Constitution and a violation of Section 17 of the Mississippi Constitution [1]. Upon due consideration, for the reasons set forth herein, the Court hereby grants the Defendant's motion.

## I.    Factual Background and Procedural History

Plaintiff John Underwood, doing business as Starkville Athletic Club, is the owner of the Starkville Athletic Club (the "Club"), a fitness center and gymnasium in Starkville, Mississippi, located in Oktibbeha County [1, at ¶ 1]. Plaintiff Joseph Underwood is the manager of the Starkville Athletic Club [*Id.*]. The Defendant is a political subdivision chartered and located in the State of Mississippi [*Id.*, at 2]. This case stems from the COVID-19 pandemic, a global health crisis that has impacted the lives of Mississippi residents as well as people across both the country and the globe. To combat the spread of this deadly disease, Mississippi Governor Tate Reeves issued Executive Order No. 1463 on March 24, 2020; this Order limited social and non-essential gatherings to groups less than 10 people but did not apply to "Essential Business[es] or Operation[s] as determined by and identified" in the Order [1-1, at 1(a)]. The term "Essential

1

Business or Operation" was defined to include: government functions such as public safety workers, law enforcement, fire prevention and response, courts and court personnel, and the military; essential healthcare workers; infrastructure workers like those at power generation facilities, telecommunications facilities, water treatment facilities, transportation and roadway/waterway/airway operations, automotive services and repair, and hotels and lodging; manufacturing and food processing facilities and operations; agricultural operations and farms; retail operations like supermarkets, gas stations, and hardware stores; trash collection operations; media enterprises; educational institutions and schools; and banks and other financial institutions [*Id.*, at ¶ 3(c)]. On April 1, 2020, Gov. Reeves issued Executive Order 1466 [1-2]. This Order mandated "Shelter-in-Place" protocols, effective from April 3, 2020, to April 20, 2020, that required residents to stay at home or at their place of residence [*Id.*, at 1(a)-(b)(i)]. The Order also mandated a social-distancing rule ordering residents to maintain a minimum of six feet of distance between each other and to avoid gatherings of more than ten people [*Id.*, at ¶ 1(b)(iii)]. This Order also required all businesses except for Essential Businesses or Operations as identified by Executive Order 1463 to cease operation and all activities except for Minimum Operations, defined by the Order as "those activities necessary for the business or operation to maintain the condition of facilities, premises and equipment, value of business inventory, payroll, employee benefits, security, and to facilitate employees of the business or operation to continue to work remotely from their residences" [*Id.*, at ¶ 1(d)]. Notably, the Order excluded fitness and exercise gyms from the "Essential Healthcare Operations" category, as well as other similarly situated enterprises like dance studios, spas, salons, and barber shops. The Governor issued Executive Order 1473 extending the Shelter-in-Place protocols to April 27, 2020 [1-3, at 1]. He then issued Executive Order 1477, known as the Safer at Home Order, which was to

2

remain in effect from April 27, 2020, to May 11, 2020 [*Id.*, at ¶ 1(a)]. This Order encouraged residents to stay at home or in their place of residence [*Id.*, at ¶ 1(b)]. It also prohibited public and private social and other non-essential gatherings in groups of more than ten people in a single space where people are in close proximity to one another [*Id.*, at ¶ 1(d)]. As with the previous order, Order 1477 mandated that fitness and exercise gyms were to remain closed to the public, as were other personal care and grooming facilities and other similarly situated businesses [*Id.*, at ¶ 1(h)(ix)]. On April 7, 2020, Starkville Mayor D. Lynn Spruill and the Board of Aldermen of the City of Starkville adopted the Second Resolution of the Mayor and Board of Aldermen of the City of Starkville, Mississippi, for the Control of Contagious and Infectious Diseases and for the Protection of Public Health and Welfare and for Related Purposes [1-4]. This Resolution, in line with national and state measures to combat the pandemic, adopted the Governor's 1463 and 1466 Orders [*Id.*, at 4]. Similarly, on March 20, 2020, the Mayor and Aldermen enacted Ordinance 2020-01, which related to punitive actions that can be taken against those who violate a local order, rule, or resolution pertaining to the prevention of contagious or infectious diseases [1-5].

The Plaintiffs allege that Starkville's Ordinance 2020-01 amounts to a "taking" of the Plaintiffs' property, under the constitutional meaning of the term, and argue that the Defendant's actions violate the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution, as well as the relevant section of the Mississippi Constitution [1, at ¶ 14]. On May 8, 2020, the Plaintiffs filed their Complaint seeking damages for this allegedly uncompensated taking and seeking actual damages for lost income and attorneys' fees [1]. On September 2, 2020, the Defendant filed its Motion to Dismiss, arguing under Federal Rule of Civil Procedure 12(b)(6) that the Plaintiffs' claims fail as a matter of law [10]. The Plaintiffs filed their Response to the

3

Defendant's Motion to Dismiss on October 7, 2020 [17]. The Defendant filed its Reply on October 14, 2020 [19]. The matter is now ready for review.

## II.  **Legal Standards**

### A.  **Rule 12(b)(6)**

When considering a Rule 12(b)(6) claim, the Court is limited by the allegations in the complaint itself, along with any documents attached to the complaint. *Walker v. Webco Indus., Inc.*, 562 F. App'x 215, 216–17 (5th Cir. 2014) (per curiam) (citing *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004)). The complaint must contain facts that, if accepted as true, would support a claim for relief that is facially plausible. *Phillips v. City of Dallas, Tex.*, 781 F.3d 772, 775–76 (5th Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). A claim is facially plausible when the facts underlying the claim allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Webb v. Morella*, 522 F. App'x 238, 241 (5th Cir. 2013) (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) (internal quotation marks omitted)). Dismissal is warranted when a plaintiff fails to present sufficient facts to support the elements of the causes of actions articulated in the Complaint, and has thereby failed to advance their complaint beyond mere speculation. *Emesowum v. Houston Police Dep't*, 561 F. App'x 372, 372 (5th Cir. 2014) (per curiam) (citing *Twombly*, 550 U.S. at 555, 570, 127 S. Ct. 1955).

III.   <u>Analysis</u>

A.   **The Fourteenth Amendment and the State's Power to Prevent the Spread of Disease**

   i.  *Jacobson v. Commonwealth of Massachusetts*: **The Prototypical Approach to Restrictions During Health Crises**

The cornerstone case in this area of the law is *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 11 (1905). The case involved Chapter 75, Section 137 of the Revised Laws of the Commonwealth of Massachusetts, which stated that "the board of health of a city or town, if, in its opinion, it is necessary for the public health or safety, shall require and enforce the vaccination and revaccination of all the inhabitants thereof, and shall provide them with the means of free vaccination. Whoever, being over twenty-one years of age and not under guardianship, refuses or neglects to comply with such requirement shall forfeit $5." *Id.* at 12. Under the aegis of this statute, the city of Cambridge, Massachusetts, adopted a regulation requiring vaccination against smallpox. *Id.* The Plaintiff in that case, Mr. Henning Jacobson, refused to be vaccinated, and was charged with violating the regulation. *Id.* at 13. At his trial, Jacobson asked for a jury instruction stating that the statute "was in derogation of the rights secured to the defendant by the Fourteenth Amendment of the Constitution of the United States." *Id.* at 14. The trial court refused his request, and Jacobson was found guilty. *Id.* On appeal, the Supreme Court of Massachusetts sustained the trial court's denial of the jury instruction, upheld the verdict, ordered Jacobson to pay his $5 fine, and had him imprisoned until the fine was paid. *Ibid.* The case made its way to the U.S. Supreme Court, which first assumed "for the purposes of the present inquiry, that [the statute's] provisions require, at least as a general rule, that adults not under the guardianship and remaining within the limits of the city of Cambridge must submit to the regulation adopted by the board of health." *Id.* at 24. The Court then undertook to answer

5

the question, "Is the statute, so construed, therefore, inconsistent with the liberty which the Constitution of the United States secures to every person against deprivation by the state?" *Id.* To answer this question, the Court balanced the liberty secured by the Constitution with the state's police power. *Id.* at 25.

> Although this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. It is equally true that the state may invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety. The mode or manner in which those results are to be accomplished is within the discretion of the state, subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument. A local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict with the exercise by the general government of any power it possesses under the Constitution, or with any right which that instrument gives or secures.

*Id.* (citations omitted).

Having established this baseline understanding of the interplay between a state's police power and the Constitution, the Court next asked if the Massachusetts statute invaded upon a constitutional right. *Id.* at 25–26. In answering that question, the Court noted that the Constitution does not leave citizens unrestrained:

> [T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could

6

not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that 'persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned.' In *Crowley v. Christensen*, we said: 'The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is, then, liberty regulated by law.' In the Constitution of Massachusetts adopted in 1780 it was laid down as a fundamental principle of the social compact that the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for 'the common good,' and that government is instituted 'for the common good, for the protection, safety, prosperity, and happiness of the people, and not for the profit, honor, or private interests of any one man, family, or class of men.' The good and welfare of the commonwealth, of which the legislature is primarily the judge, is the basis on which the police power rests in Massachusetts.

*Id.* at 26–27 (citations omitted).

The Court then turned to the Massachusetts statute, and noted that the "authority to determine for all what ought to be done in such an emergency must have been lodged somewhere or in some body." *Id.* at 27. Given the urgency of the smallpox outbreak at the time, the Court established that the Massachusetts legislature and its board of health had the power to protect the public health through the enactment of necessary appropriate regulations. *Id.* "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members....Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of

7

government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." *Id.* at 27–28.

Thus, the Court established the principle that the matters of public health and safety are "functions of another branch of government" and it would be impermissible judicial overreach and a violation of the separation of powers if the Court were to second-guess the modes used by the legislative and executive branches "to protect the people at large" so long as they are not arbitrary or unreasonable. *Id.* Even in instances of competing theories regarding public safety, it is the legislature's prerogative and responsibility to decide on the appropriate course of action. *Id.* at 30. As such, the judiciary has no place in adjudicating or relitigating such decisions. *Id.*

> [The legislature] was not compelled to commit a matter involving the public health and safety to the final decision of a court or jury. It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain. It could not properly abdicate its function to guard the public health and safety. The state legislature proceeded upon the theory which recognized vaccination as at least an effective, if not the best-known, way in which to meet and suppress the evils of a smallpox epidemic that imperiled an entire population. Upon what sound principles as to the relations existing between the different departments of government can the court review this action of the legislature? If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 30–31 (citations omitted).

Setting aside the issue of separation of powers, the Supreme Court rooted its analysis in the age-old maxim that the needs of the many outweigh the needs of the few. As the Supreme Court stated, "[i]f the mode adopted by the Commonwealth of Massachusetts for the protection of its local communities against smallpox proved to be distressing, inconvenient, or objectionable to some,—if nothing more could be reasonably affirmed of the statute in question,—the answer is that it was the duty of the constituted authorities primarily to keep in view the welfare, comfort, and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few." *Id.* at 28–29.

The Court reiterates this notion toward the end of its opinion, and incorporates the role of the judiciary as distinct and removed from "the domain of local authority." *Id.* at 38.

> We are not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent, and enjoying the general protection afforded by an organized local government, may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state. If such be the privilege of a minority, then a like privilege would belong to each individual of the community, and the spectacle would be presented of the welfare and safety of an entire population being subordinated to the notions of a single individual who chooses to remain a part of that population. We are unwilling to hold it to be an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state. While this court should guard with firmness every right appertaining to life, liberty, or property as secured to the individual by the supreme law of the land, it is of the last importance that it should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law. The safety and the health of the people of Massachusetts are, in the first instance, for that commonwealth to guard and protect. They are matters that do not ordinarily concern the national government. So far as they can be reached by any government, they depend, primarily, upon such action as the state, in its wisdom, may take; and we do not perceive that this legislation has invaded any right secured by the Federal Constitution.

*Id.* at 38–39.

The Court essentially applied in *Jacobson* what has come to be known as rational basis review. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 70 (2020) (Gorsuch, J., concurring). This is the test that courts generally use when faced with Fourteenth Amendment challenges that do not involve suspect classifications based on race or some other similar ground, or some other similar claim of a fundamental right being violated. *Id.*

It is worth noting that the Fifth Circuit has come across this issue to some degree already in a case involving COVID-19 regulations limiting access to abortions. *In re Abbott*, 956 F.3d 696, 703 (5th Cir. 2020). However, the Supreme Court vacated the Fifth Circuit's decision in that case, *Planned Parenthood Center for Choice v. Abbott*, 141 S.Ct. 1261 (Mem) (2021), leaving *Jacobson* as the lodestar by which this Court navigates.

### ii. Application to the Case *Sub Judice*

While "judicial deference in an emergency or a crisis does not mean wholesale judicial abdication, especially when important questions of religious discrimination, racial discrimination, or free speech, or the like are raised," *Roman Catholic Diocese of Brooklyn*, 141 S.Ct. at 74 (Kavanaugh, J., concurring), the Court sees no reason to depart from this policy of judicial deference in the case *sub judice*. There is no doubt that the State has the authority "to impose tailored restrictions—even very strict restrictions" when faced with a national crisis on the order of the COVID-19 pandemic. *Id.* Under either the prototypical rational basis review laid out in *Jacobson* or under later iterations of this test, the regulations in dispute in this case are clearly constitutional. These regulations address a legitimate state interest, i.e. safeguarding public health, and are rationally related to that interest. There are no fundamental rights at odds in this case, in spite of the Plaintiffs' best efforts to argue otherwise. As the Defendant correctly points out, the right to work is not a fundamental right. *See Massachusetts Bd. of Retirement v.*

10

Case: 1:20-cv-00085-GHD-DAS Doc #: 21 Filed: 05/11/21 11 of 20 PageID #: 193

*Murgia*, 427 U.S. 307, 313 (1976) (holding that the Court has "expressly stated that a standard less than strict scrutiny 'has consistently been applied to state legislation restricting the availability of employment opportunities,'" quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). Thus, strict scrutiny is neither warranted nor appropriate. Furthermore, while the City may have implemented other methods in order to achieve its goals, it is not the place of the Court to criticize the government's modes and methodologies for combating this deadly disease. *See Jacobson*, 197 U.S. at 30–31. "[T]he Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Dandridge*, 397 U.S. at 486 (1970).

The Plaintiffs argue that the regulations deprive them of their procedural due process rights by denying them a post-deprivation hearing in which they can make their case against their classification under the regulations [18, at 8–11]. However, the case that they themselves cite cuts against them. That case, which in any event is from another District Court and not the Fifth Circuit or Supreme Court, states that to win on a due process claim, a plaintiff would have to satisfy the *Jacobson* test. *4 Aces Enterprises, LLC v. Edwards*, 479 F.Supp.3d 311, 327 (E.D. La. 2020). As noted above, the Plaintiffs cannot pass this test. Even if this were not so, "[i]n altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements." *U.S. v. Locke*, 471 U.S. 84, 108 (1985). The Plaintiffs build their case on an expansive reading of *Cty. of Butler v. Wolf*, a case out of the Western District of Pennsylvania in which the Court remarked on the role of the independent judiciary as

11

a check against governmental overreach [18, at 11]. *Cty. of Butler v. Wolf*, 486 F.Supp.3d 883, 899 (W.D. Pa. 2020). But the Court sees no such governmental overreach in the case *sub judice*.

The Plaintiffs insinuate that upholding these limited health regulations would be tantamount to a modern-day *Korematsu v. United States*, a case in which the Supreme Court upheld a governmental order interring Japanese-Americans into concentration camps during World War II. 323 U.S. 214, 219 (1944). In 2018, the Supreme Court decried this order as "morally repugnant" and "objectively unlawful," and explicitly overruled the Court's *Korematsu* decision. *Trump v. Hawaii*, 138 S.Ct. 2392, 2423 (2018). In the matter at hand, however, the Defendant's regulations correlate to a rule of general applicability, not a gross violation of civil rights. It would be impractical—if not nonsensical—to allow every individual member of the public to voice their opinion directly and personally before a rule of general applicability is put into effect, particularly during a time of crisis like the one before us in the case *sub judice*. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). "General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Id.*

The Plaintiffs' equal protection claim is similarly flawed. As noted above, strict scrutiny is inapplicable in this context. As such, to survive a constitutional challenge to a regulation like the one *sub judice*, the government need only demonstrate that the regulation is rationally related to a legitimate government interest. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). The Defendant in this case has met this burden, as discussed *supra*. Even were this not so, the Plaintiffs still lose on the merits of their argument. To succeed on an equal protection claim, a

plaintiff must show that they were intentionally treated differently from another similarly situated party and that there was no rational basis for the difference in treatment. *Lindquist v. City of Pasadena, Texas*, 669 F.3d 225, 233 (5th Cir. 2012). The Plaintiffs argue that the Defendant's operation of a police gym while the Plaintiffs' own gym was closed during the period in which the regulations were in effect is "irrational" and violates their right to equal protection [18, at 5]. However, this argument itself is spurious. The operation of a police gym, used to ensure the fitness of officers serving the public, is an obvious part of a public function, just like other elements and settings of police work, like a police station. Those operating private gyms like the Plaintiffs' can make no such claim. Any difference in treatment between the two is a natural and rational consequence of this public function. Thus, the Plaintiffs cannot satisfy the elements needed to advance their equal protection claim.

In sum, the Plaintiffs' Fourteen Amendment arguments fail, and the Defendant's Motion to Dismiss shall be granted as to these issues.

**B. The Fifth Amendment and the Takings Clause**

### i. Defining What Constitutes a 'Taking' Under *Penn Central*

To determine if the Defendant's COVID-19 regulations constitute a "taking" under the Fifth Amendment, the Court begins by discussing the meaning of that term in this context. The Fifth Amendment states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). However, in some cases, the government regulation of private property may "be so onerous that its effect is tantamount to a direct appropriation or

13

ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment."
*Id.*

While this mandate is "'designed to bar Government from forcing some people alone to
bear public burdens which, in all fairness and justice, should be borne by the public as a
whole....,' whether a particular restriction will be rendered invalid by the government's failure to
pay for any losses proximately caused by it depends largely 'upon the particular circumstances
[in that case].'" *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123–24 (1978). The
Supreme Court has identified three factors that courts can use "when engaging in these
essentially ad hoc, factual inquiries." *Id.* at 124. These factors include: "the economic impact of
the regulation on the claimant," "the extent to which the regulation has interfered with distinct
investment-backed expectations," and the "character of the governmental action." *Ibid.*

This third factor is particularly relevant in cases involving regulations designed to counter
public threats like the COVID-19 pandemic. This is true because a regulation is less likely to be
considered a taking when "interference arises from some public program adjusting the benefits
and burdens of economic life to promote the common good," in contrast to a situation in which
the "interference with property can be characterized as a physical invasion by government."
*Ibid.* As the Supreme Court noted in 1922, "[g]overnment hardly could go on if to some extent
values incident to property could not be diminished without paying for every such change in the
general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922). That principle
remains axiomatic a century later, and is certainly applicable today. Furthermore, it is true that
even if a law has "a more severe impact on some landowners than on others... that in itself does
not mean that a law effects a 'taking'" in that "[l]egislation designed to promote the general
welfare commonly burdens some more than others." *Penn Central*, 438 U.S. at 133. The

14

principle behind this rule is simple: "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92 (1987) (quoting *Mugler v. Kansas*, 123 U.S. 623, 665 (1887)).

The Supreme Court has "stake[d] out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle*, 544 U.S. at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). The second category relates to "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original)). If a regulatory challenge does not fall within one of these two categories, then the standards expressed in *Penn Central* govern the case. *Ibid.* Additionally, the Supreme Court has long held under the so-called "doctrine of necessity" that, when faced with a societal danger, "the sovereign could, with immunity, destroy the property of a few that the property of the many and the lives of many more could be saved." *United States v. Caltex*, 344 U.S. 149, 154 (1952); *see also Lucas*, 505 U.S. at 1029 n. 16 (1992). As one prominent example, the Supreme Court upheld the applicability of this doctrine in a case in which fire protection engineers, in an effort to stop the progress of a fire, demolished a building that was not yet burning but was in a place that would have allowed the blaze to spread. *Bowditch v. City of Boston*, 101 U.S. 16, 18–19 (1880).

### ii. Application to the Case *Sub Judice*

It is clear to the Court that the doctrine of necessity applies to the case *sub judice*. The COVID-19 pandemic presents a grave and deadly threat to the public, and this was perhaps even more so during the early months of the crisis, when the events of this case took place. Just as with *Bowditch* and the destruction of an untouched building to stem the spread of a fire, the Defendant in this case was justified in its actions to stem the spread of the disease. Consequently, the Defendant is immune from liability for these specific actions.

Even if this were not the case, the Plaintiffs' argument fails in the face of the *Penn Central* standards for resolving challenges to government regulations. These standards apply because the Defendant's actions are not *per se* takings under either category articulated in *Lingle*—there has been neither a permanent physical invasion nor a complete deprivation of all economic benefit of the property—and thus *Penn Central* governs. The Court takes the factors discussed in that case in turn. First, there is no evidence in the record to support a contention that the economic impact of the regulation, the first *Penn Central* factor, was especially severe. Firstly, the regulations were only in effect for five weeks, which represents a relatively small amount of time. Secondly, the Plaintiffs allege that the regulations resulted in lost profits, but this is speculative; there is no evidence that the Plaintiffs would have made money during those five weeks, when the pandemic itself and the public's presumed desire to avoid the disease could have resulted in lost profits even in a scenario in which the regulations were not in play. Thirdly, the regulations did not entirely cut off the potential for profits, in that the Plaintiffs could have adapted their business to conform to the regulations while still remaining profitable. The pandemic has caused much of the world to adapt to new technologies and techniques, such as videoconferencing, online sessions, and individualized options designed to conform to social-

16

distancing guidelines. The Plaintiffs were presented with this same opportunity; they chose not to take it.

The second *Penn Central* factor, the extent of the regulation's interference with distinct investment-backed expectations, is equally unavailing. "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 457 U.S. 986, 1005 (1984). The Plaintiffs fail to present any such expectation beyond their own unilateral conceptions about the speculative profits of their business when compared to pre-pandemic circumstances. Lastly, the third factor, the character of the government's actions, supports the notion that this was not a taking. The government acted in response to a rapidly changing situation, prompted by a deadly threat the likes of which the nation has not experienced in over a century. It enacted limited regulations, defined and tailored to prevent the spread of the disease, and adapted and altered its regulations regularly and quickly.

Simply put, the character of these actions is akin to that of other historical examples of governmental actions undertaken to counter serious threats to the public that were subsequently found not to be takings. Taken together, the *Penn Central* factors indicate that the regulations in this case are not a taking. For these reasons, the Plaintiffs' Fifth Amendment claim fails, and the Defendant's Motion to Dismiss is granted as to this point.

## C. The Takings Clause of the Mississippi Constitution

The Plaintiffs argue that the regulations violate Article 3, Section 17 of the Mississippi Constitution [18, at 18], which states that "[p]rivate property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof." Miss. Const. art III, § 17. However, they themselves argue that the *Penn Central* factors apply when

17

confronting this issue [*Id.*, at 19]. As noted above, these factors militate toward a holding that the regulations in this case are not considered to be a taking.

The Plaintiffs similarly argue that the regulations *sub judice* are "damage" as the term is meant under the Mississippi Constitution and that the language "or damaged" makes the Mississippi Constitution both broader than its federal counterpart and more applicable in this case [*Id.*]. While this language may or may not create broader protection, it has no applicability here. As the Supreme Court of Mississippi noted, "it is clear that, under Article 3, Section 17, damages are rendered for the appropriation of or damage to real property. Any other injuries, personal or otherwise, must be pleaded separately." *City of Tupelo v. O'Callaghan*, 208 So.3d 556, 573 (Miss. 2017). Citing a Mississippi Supreme Court case, the U.S. District Court for the Southern District of Mississippi reached a similar conclusion, holding that a takings challenge fails when it does not concern real property. *Clemons v. U.S.*, 2013 WL 3943494 *15 (S.D. Miss. 2013). In that Mississippi case, the plaintiff claimed that a statutory cap on recovery for damages caused in school bus accidents violated the state constitution's Takings Clause, a claim that the Mississippi Supreme Court rejected out of hand as "creative, but not persuasive" and "without merit." *Wells by Wells v. Panola County Bd. of Educ.*, 645 So.2d 883, 895. So to in the case at hand. Since the regulations *sub judice* do not physically impact real property but instead allegedly create other causes of action—the Plaintiffs argue that they create harm by preventing them from pursuing their business endeavors and resulting in lost potential profits—they do not violate the state constitution's Takings Clause, and the Plaintiffs' argument fails. For this reason, the Defendant's Motion to Dismiss is granted as to this issue as well.

**D. Dismissal of the Plaintiffs' Fourth Amendment Claim**

The Plaintiffs allege that the Defendant's regulations constitute an unreasonable seizure of their property, and therefore violate the Fourth Amendment [1, at ¶ 22]. However, the Plaintiffs fail to present any legal analysis in support of this contention, and merely state it in a conclusory fashion. Likewise, the Plaintiffs fail to provide any legal analysis or jurisprudential support to counter the Defendant's argument that the "traditional standards of reasonableness" apply in this case [11, at 23]. *Freeman v. City of Dallas*, 242 F.3d 642, 649 (5th Cir. 2001). Furthermore, as the Defendant notes, the Court of Appeals for the Fifth Circuit has held that, within the context of the Fourth Amendment, there is only a seizure of property if there has been "some meaningful interference with an individual's possessory interest in that property." *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009). There has been no such interference in the case *sub judice*. Thus, the Defendant's Motion to Dismiss is granted as to this issue as well.

**E. Dismissal of Plaintiff Joseph Underwood for Lack of Standing**

The Defendant argues that Plaintiff Joseph Underwood should be dismissed from this proceeding for lack of standing, in that he has no ownership interest in Starkville Athletic Club and therefore has neither suffered a particularized harm due to the Defendant's regulations nor been deprived of a property interest [11, at 6–7]. The Plaintiff fails to rebut this argument in any way. As such, it is conceded, and the Defendant's Motion to Dismiss is granted as to this issue as well.

**IV. <u>Conclusion</u>**

In sum, the Plaintiffs' case simply lacks merit as a matter of law. Moreover, from a public policy perspective, were the Court to allow the Plaintiffs' case to proceed, it would call

19

into question every regulatory restriction as a possible constitutional violation, and jeopardize our entire system of administrative action. This the Court is unwilling to do. For the reasons stated above, the Defendant's Motion to Dismiss is GRANTED in its entirety.

An order in accordance with this opinion will issue on this day.

THIS, the 11ᵗʰ of May, 2021.

_____

SENIOR U.S. DISTRICT JUDGE